# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MOHAMMAD YUSUF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01394 |
| | ) | |
| CITY OF CHICAGO, a municipal corporation | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

1. This action is brought by Mohammad Yusuf ("Yusuf") against the City of Chicago Police Department ("Defendant" or "CPD") for employment discrimination based on race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. §§ 1981, 1983, and Equal Protection arising from Defendant's discriminatory Merit Promotion Process and arbitrary refusal to allow Yusuf to change his racial identity.

## PARTIES

2. Yusuf Muhammed Yusuf ("Yusuf") has been employed as a Chicago Police officer since 2004. He currently resides in Chicago, Illinois. He currently identifies as Egyptian and African American. Yusuf wishes to correct the racial designation listed on his police personnel file, which currently indicates that he is Caucasian, to accurately reflect his race, as North African.

3. Defendant, City of Chicago is a municipality incorporated in the State of Illinois, and the Chicago Police Department is a division within this municipality (hereinafter "CPD" or Department). Defendant has indemnification obligations for wrongful acts committed by

1

its officials, employees, and agents. See 745 ILCS §§ 10/1-202 and 9-102. It is responsible for the challenged actions of any unknown individual defendants and the Chicago Police Department.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 because this action seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution through 42 U.S.C. § 1983.

5. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in the district and because a substantial part of the events or omissions giving rise to the claims occurred in the district.

6. This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

7. Plaintiff has exhausted all administrative prerequisites and timely filed this Complaint. Yusuf's Right to Sue notice is attached hereto as Exhibit A.

## FACTUAL ALLEGATIONS

8. Racial identity, as experienced by an individual, encompasses a sense of belonging to a specific racial group, influenced significantly by psychological, sociopolitical, cultural, and contextual factors related to group membership.[1]

9. At CPD, access to employment and promotional opportunities often depends on accurate documentation reflecting an individual's true identity.

---

[1] https://dictionary.apa.org/racial-identity

10. On belief, when Yusuf became a CPD officer; there were only a few categories that an officer could select as his or her designated race due to the restrictive racial designations (e.g., Caucasian, Hispanic, or African American) offered by CPD's personnel paperwork.

11. Yusuf was compelled to identify as Caucasian, despite not identifying as white.

12. Yusuf initially perceived this as a minor administrative inconvenience, expecting that CPD would revise its procedures to reflect an evolving societal understanding of race.

13. On further belief, the Chicago Police Department ("CPD") now allows officers to select from over nine different racial designations.

**CPD's Refusal to Allow an Officer to Change their Racial Identity**

14. CPD enforces a blanket prohibition against amending officers' racial or ethnic identity in personnel records.

15. Despite the apparent increase in racial designations available on CPD's current application forms, Officer Yusuf has been consistently denied the opportunity to alter his racial designation within the department.

16. Even though race and ethnicity are social constructs, Defendant CPD demanded that Yusuf provide "proof" of his race or ethnicity before it would change his race or ethnicity in his personnel paperwork.

17. Yusuf complied and took a "23 and Me" test to confirm his race.

18. Even after Officer Yusuf provided DNA evidence confirming his racial heritage, the CPD continued to deny his request to alter his racial designation. This denial was justified by referencing an unspecified CPD policy, which arbitrarily asserts that changing one's racial identity is "not possible."

19. The CPD's position that racial identity is immutable contradicts contemporary understandings of race as a fluid and complex social construct. This outdated viewpoint fails to recognize the dynamic nature of racial identity and has tangible, adverse effects on Officer Yusuf's professional experiences within the police force.

20. Defendant enforces a policy and practice that categorically refuses to change the racial markers on individual officers' personnel records to match his or her racial or ethnic identity ("Racial Identity Policy Ban").

**The CPD's Double Standard on Correcting Personal Identity Markers**

21. Racial identity can significantly influence one's experiences as a police officer, shaping perceptions and treatment from colleagues and the public, and can consequently affect professional development and mental health.

22. By rigidly enforcing an incorrect racial designation, CPD fosters a discriminatory work environment and inflicts harm on officers like Plaintiff by negating their true racial identity.

23. While other CPD officers are afforded the opportunity to have their gender identity corrected to match their lived experience, Officer Yusuf and others in similar positions are barred from obtaining accurate racial designations that align with their racial identity.

24. Accurate identity documentation is a cornerstone of dignified treatment within the workplace and is pivotal in accessing fair employment and promotional opportunities, which in CPD's current environment, hinge on the accurate reflection of an individual's racial identity.

25. No compelling government interest justifies CPD's refusal to correct the racial identity markers for individuals misclassified, particularly in light of the socially constructed nature of racial categories and their profound impact on personal and professional spheres.

**The Importance of Precise Racial and Ethnic Self-Identification**

26. Within CPD, a person's racial designation is more than a simple checkbox. It reflects the ability to qualify for merit-based promotions.

27. The necessity for precise racial and ethnic identification within CPD transcends mere administrative detail; it is essential for the fair allocation of employment opportunities (e.g. promotion) and the acknowledgment of each officer's dignity.

28. Despite allowing officers to update their gender identity, CPD has unequivocally refuses to extend the same respect and acknowledgment to changes in racial identity, creating a double standard in personal identity recognition.

29. This is particularly true for Middle Eastern and Northern African individuals who face significant discrimination in various environments, including the workplace.

30. There is no statute or regulation that would prohibit Defendants from changing the racial marker on a police officer's personnel paperwork.

31. CPD's categorical bar with respect to changing racial markers on personnel paperwork is contrary to even its own practice with respect to officers who wish to change their gender.

32. On further belief, CPD also does not require that transgender individuals provide proof of their transition before making the change. That practice is consistent with mainstream medical organizations, which oppose requiring surgery in order for transgender individuals to change their identity documents.

33. The Racial Identity Policy Ban is not supported by any compelling, substantial, or even legitimate government interest.

34. The Racial Identity Policy Ban lacks any narrowly-tailored, substantial, or even rational relationship to a valid government interest, and it is not the least restrictive means of achieving a valid government interest.

35. CPD's Racial Identity Policy Ban violates federal constitutional guarantees, including the rights to equal protection, Title VII, §§ 1981, 1983, and freedom from compelled speech.

**CPD's Controversial Merit-based Promotions**

36. Sergeants supervise the officers, and lieutenants, in turn, supervise the sergeants.

37. Since 1998, the testing processes for sergeant and lieutenant in the CPD have included a written exam and an assessment for passing candidates, with rankings based on assessment scores, broken by seniority and birth date.

38. From the late 1990s to 2019, a merit process also offered an alternative promotion route to recognize potential supervisory qualities in personnel who may not excel in testing, particularly benefiting minority candidates.

39. The promotion processes for sergeant and lieutenant within the CPD have faced numerous legal challenges and allegations of unfairness, including accusations of cheating on exams in 2015, issues with the 2006/2007 lieutenant oral assessments, and a 1998 sergeant exam incident, involving both minority and non-minority, as well as female and male officers.[2]

40. In 2019, Interim Chicago Police Superintendent Charlie Beck put a temporary halt to merit promotions in the department.

41. In 2021, CPD reinstated its Merit System for sergeant and lieutenant promotions.

42. The Merit System allows nominations from high-ranking officials for promotions.

---

[2] Cases referencing the sergeant process: Adams v. City of Chicago (2006); Allen v. City of Chicago (2003); Barnhill v. City of Chicago, Police Department (2001); Price v. City of Chicago (2001). Cases referencing the lieutenant process: Brown v. City of Chicago (1998); Bryant v. City of Chicago (2000). Cases pertaining to both processes: Reynolds v. City of Chicago (2002); United States v. City of Chicago (1976, 1975, 1974)

43. On belief, in 2021, the Merit System changed from exceptional leadership and performance to increase Black and Latino representation in supervisory roles.

44. On further belief, some of the nominators included retired or deceased command staff members.

45. The Merit System has been criticized for lacking transparency and fostering cronyism over merit or diversity.

46. The Department of Justice criticized the CPD's Merit selection process for lack of transparency and fairness, recommending reforms to fairly increase diversity within the Department.

47. CPD has ignored these recommendations and, instead, continues a pattern of racial discrimination in promotions.[3]

## The Impact of Yusuf's Incorrect Racial Identity

48. Yusuf's CPD personnel paperwork reflects his racial designation as Caucasian.

49. Yusuf took the 2019 Sergeant's exam and allegedly scored in the first promotional tier.

50. Throughout Yusuf's career, Yusuf has demonstrated superior ability, responsibility, and dedication to police service. Yusuf has also received numerous accolades demonstrating strong indicia of leadership, mentoring, decision-making, and interpersonal relations.

51. Throughout Yusuf's tenure at CPD, he has exhibited outstanding ability, responsibility, and dedication to the police service, as evidenced by numerous accolades and recognitions for leadership, mentoring, decision-making, and interpersonal skills.

52. On belief, around 30% of the recent promotions to sergeant within the department were based on merit.

---

[3] https://www.chicago.gov/content/dam/city/sites/police-reform/docs/CPD%20Sgt%20and%20Lt%20Promotion%20Recommendations_12.30.2020_final%20(1).pdf

53. On belief, based on the 2019 sergeant's exam, there have been over 75 Merit Promotions to sergeant.

54. On further belief, less than five ("5") of the officers who received Merit Promotions to sergeant, identify as "Caucasian."

55. It is believed that several of the merit-based promotions are questionable, as they have advanced African American officers with problematic histories. This includes officers with Brady List violations, judicial findings questioning their credibility—which affects their capacity to approve police reports (a necessary duty for sergeants), records of excessive force, or those with personal connections to high-ranking CPD officials, with their race being a potential factor in their promotion.

56. Despite Yusuf's exemplary qualifications and the purported race-neutral policy of the Merit System, Yusuf has been repeatedly bypassed for promotion in favor of less qualified candidates, based on their race, specifically African American officers, some of whom had disciplinary issues and were not suitable for the responsibilities of a sergeant.

57. The CPD's Merit-Based Promotion Process has been improperly used to discriminate against Yusuf, favoring individuals of certain races over others. This has adversely affected Yusuf's career progression within the department, not only by rank and pay but also because a sergeant earns .75 hours a day of compensation time per 8-hour shift.

### COUNT I: DISCRIMINATORY TREATMENT AND FAILURE TO CORRECT RACIAL DESIGNATION IN VIOLATION OF TITLE VII

58. Yusuf incorporates the paragraphs above as though fully set forth herein.

59. CPD has allowed changes in personal identity markers such as gender within its administrative records, demonstrating its capability to respect and adapt to changes in societal understandings and individual identities. Yet, it has arbitrarily refused to allow

Yusuf, and presumably others, to update their racial designation, effectively imposing an incorrect and immutable racial identity on officers such as Yusuf.

60. CPD's refusal to allow changes to an officer's racial designation while accommodating changes to other personal attributes represents a violation of Title VII of the Civil Rights Act of 1964.

WHEREFORE, for the foregoing reasons, Plaintiff Mohammad Yusuf requests that this Court enter judgment in his favor and against Defendant City of Chicago in an amount to be proved at trial and for all such other relief to which he is entitled, and the Court deems just and proper.

## COUNT II PROMOTION PRACTICES IN VIOLATION OF TITLE VII

61. Yusuf incorporates the paragraphs above as though fully set forth herein.

62. Based on the Defendant's incorrect racial designation of Yusuf as Caucasian, he has been passed over for the Merit System promotion to sergeant.

63. CPD's refusal to allow changes to an officer's racial designation while accommodating changes to other personal attributes represents a violation of Title VII of the Civil Rights Act of 1964.

WHEREFORE, for the foregoing reasons, Plaintiff Mohammad Yusuf requests that this Court enter judgment in his favor and against Defendant City of Chicago in an amount to be proved at trial and for all such other relief to which he is entitled, and the Court deems just and proper.

## COUNT III 42 U.S.C. § 1983 FIRST CAUSE OF ACTION EQUAL PROTECTION VIOLATION

64. Yusuf incorporates the paragraphs above as though fully set forth herein.

65. CPD's Racial Identity Policy Ban deprives certain police officers their right to equal dignity and stigmatizes them as second-class citizens in violation of the Equal Protection Clause.

66. The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

67. The racial categories that CPD lists on its personnel paperwork failed to account for individuals of mixed races or individuals like Yusuf who are Middle Eastern and African and do not identify as "white."

68. The Racial Identity Policy Ban facially and intentionally discriminates against certain individuals based on personally identifiable characteristics like race.

69. While other CPD officers can correct their gender to match their gender identity, other officers, like Yusuf, are barred from obtaining accurate racial designations matching their racial identity.

70. CPD categorically refuses to change the racial markers of certain individuals improperly designated as Caucasian to match their correct racial identity, regardless of what steps such individuals have taken to properly identify their racial identity.

71. CPD's refusal to allow officers to correct their racial identity erects a barrier to the full recognition, participation, and inclusion of officers like Yusuf, and subjects them to discrimination, privacy invasions, harassment, humiliation, and stigma.

72. Discrimination based on race-related considerations also includes discrimination based on racial non-conformity and racial identity.

73. Discrimination based on an individual's race is entitled to strict scrutiny.

WHEREFORE, for the foregoing reasons, Plaintiff Mohammad Yusuf requests that this Court enter judgment in his favor and against Defendant City of Chicago in an amount to be proved at trial and for all such other relief to which he is entitled, and the Court deems just and proper.

## COUNT IV - §1981 Racial Discrimination

74. Yusuf incorporates the paragraphs above as though fully set forth herein.

75. The discriminatory practices of the CPD, as detailed herein, not only constitute violations of Title VII but also infringe upon the equal protection principles embodied in 42 U.S.C. § 1981. These practices, by discriminating against Yusuf and others based on racial identity, deny them the full and equal benefit of all laws, as guaranteed by § 1981.

76. Given the government's role in these discriminatory practices, and the fundamental nature of racial identity as an aspect of individual identity and autonomy, these actions warrant the application of strict scrutiny by this Court. The CPD's practices cannot be justified by any compelling governmental interest and are not narrowly tailored to achieve any such interest, thus failing the strict scrutiny test.

77. Defendant's conduct, including the discriminatory application of its Merit Promotion Process and refusal to acknowledge Yusuf's racial identity, has violated Yusuf's rights under 42 U.S.C. § 1981 to make and enforce contracts, including employment contracts,

## COUNT V - FIRST AMENDMENT VIOLATION

78. Yusuf incorporates the paragraphs above as though fully set forth herein.

79. The First Amendment to the United States Constitution provides that a state "shall make no law . . . abridging the freedom of speech."

80. The First Amendment protects both the right to speak and the right to refrain from speaking.

81. The Racial Identity Policy Ban violates the First Amendment rights of certain individuals to refrain from speaking by forcing them to identify with a race that conflicts with who they are or their social experience.

## COUNT VI INDEMNIFICATION

82. Yusuf incorporates the paragraphs above as though fully set forth herein.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Court enter judgment in his favor and against Defendant and order the City of Chicago, Illinois to indemnify the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Yusuf respectfully requests that this Court:

A. Conduct a mediated settlement conference or to refer the case to its court-annexed mediation program to assist the parties to bring about a settlement of this case;

B. Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the Racial Identity Policy Ban unconstitutional on its face and as applied for the reasons set forth above;

C. Permanently enjoin Defendants, their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them from enforcing the Racial Identity Policy Ban, including from refusing to allow individuals like Yusuf that accurately reflect their race, consistent with their racial identity;

D. Award Yusuf costs, expenses, and reasonable attorneys' fees pursuant to 42 18 U.S.C. § 1988 and any other applicable laws; and

E. Grant any injunctive or other relief that this Court deems just, equitable, and proper.

Respectfully Submitted,

Mohammad Yusuf

GB Law
Gianna Scatchell Basile

1821 W Hubbard Street, #209
Chicago, Illinois 60622
(312) 248-3303
gb@lawfirm.gs